**ERIC A. LIEPINS**
**ERIC A. LIEPINS, P.C.**
12770 Coit Road, Suite 1100
Dallas, Texas 75251
(972) 991-5591
(972) 991-5788 - Telefax

Attorneys for Debtor

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| LOCHRANN'S IRISH PUB & EATERY, LTD | § | CASE 10-43929-11 |
| | § | |
| DEBTOR | § | |

**DISCLOSURE STATEMENT OF LOCHRANN'S IRISH PUB & EATERY, LTD. PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE DATED MARCH 10, 2011**

TO: ALL PARTIES-IN-INTEREST, THEIR ATTORNEYS OF RECORD AND TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

I

# INTRODUCTION

### Identity of the Debtor

Lochrann's Irish Pub 7 eatery, Ltd. ("Lochrann's") is a limited partnership which filed its voluntary Chapter 11 case in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division ("Court") on November 9, 2010. Lochrann's operates a pub and restaurant in Frisco Texas. Debtor proposes to continue operation to pay a dividend to its creditors.

### Purpose of Disclosure Statement; Source of Information

Debtor submits this Disclosure Statement ("Disclosure Statement"); pursuant to Section 1125 of the Code to all known Claimants of Debtor for the purpose of disclosing that information which the Court has determined is material, important, and necessary for Creditors of Debtor in order to

arrive at an intelligent, reasonably informed decision in exercising the right to vote for acceptance or rejection of the Debtor's Joint Plan of Reorganization dated March 10, 2011 ("Plan"). This Disclosure Statement describes the operations of the Debtor contemplated under the Plan. You are urged to study the Plan in full and to consult with your counsel about the Plan and its impact upon your legal rights. Any accounting information contained herein has been provided by the Debtor.

### Explanation of Chapter 11

Chapter 11 is the principal reorganization chapter of the Code. Pursuant to Chapter 11, a Debtor is authorized to reorganize its business for its own benefit and that of its creditors and equity interest holders. Formulation of a Plan is the principal purpose of a Chapter 11 reorganization case. A Plan sets forth the means for satisfying claims against and interests in the Debtor. After a Plan has been filed, it must be accepted by holders of claims against, or interests in, the Debtor. Section 1125 of the Code requires full disclosure before solicitation of acceptances of a Plan. This Disclosure Statement is presented to Claimants to satisfy the requirements of Section 1125 of the Code.

### Explanation of the Process of Confirmation

Even if all Classes of Claims accept the Plan, its confirmation may be refused by the Court. Section 1129 of the Code sets forth the requirements for confirmation and, among other things, requires that a Plan of reorganization be in the best interests of Claimants. It generally requires that the value to be distributed to Claimants may not be less than such parties would receive if the Debtor were liquidated under Chapter 7 of the Code.

Acceptance of the Plan by the Creditors and Equity Interest Holders is important. In order for the Plan to be accepted by each class of claims, the creditors that hold at least two thirds (2/3) in amount and more than one-half (½) in number of the allowed claims actually voting on the Plan in such class must vote for the Plan and the equity interest holders that hold at least two-thirds (2/3) in amount of the allowed interests actually voting on the Plan in such class must vote for the Plan. Chapter 11 of the Code does not require that each holder of a claim against, or interest in, the Debtor vote in favor of the Plan in order for it to be confirmed by the Court. The Plan, however, must be accepted by: (i) at least the holder of one (1) class of claims by a majority in number and two-thirds (2/3) in amount of those claims of such class actually voting; or (ii) at least the holders of one (1) class of allowed interests by two-thirds (2/3) in amount of the allowed interests of such class actually voting.

The Court may confirm the Plan even though less than all of the classes of claims and interests accept it. The requirements for confirmation of a Plan over the objection of one or more classes of claims or interests are set forth in Section 1129(b) of the Code.

Confirmation of the Plan discharges the Debtor from all of their pre-confirmation debts and liabilities except as expressly provided for in the Plan and Section 1141(d) of the Code. Confirmation makes the Plan binding upon the Debtors and all claimants, equity interest holders and other parties-in-interest, regardless of whether or not they have accepted the Plan.

### Voting Procedures

**Unimpaired Class**. Claimants in Class 1and 7 are not impaired under the Plan. Such Classes is deemed to have accepted the Plan.

**Impaired Classes**. The Class 2 through 6 Claimants are impaired as defined by Section 1124 of the Code. The Debtor is seeking the acceptance of the Plan by Claimants in Classes 2 through 6. Each holder of an Allowed Claim in Classes 2 through 6 may vote on the Plan by completing, dating and signing the ballot sent to each holder and filing the ballot as set forth below.
The Debtor is seeking acceptance of the Plan by the Allowed Secured Claims and Allowed Priority Claims, and Allowed Unsecured Claims.
Except to the extent permitted by the Bankruptcy Court pursuant to Rule 3018 of the Bankruptcy Rules, ballots that are received after the Voting Deadline will not be accepted or used by the Debtor in connection with the Debtors' request for confirmation of the Plan.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt) acceptance and revocation or withdrawal of ballots or master ballots will be determined by the Debtor in its sole discretion, whose determination will be final and binding.

For all Classes, the ballot must be returned to Eric A. Liepins, 12770 Coit Road, Suite 1100, Dallas, Texas 75251. In order to be counted, ballots must be **RECEIVED** no later than at the time and on the date stated on the ballot.

### Best Interests of Creditors Test

Section 1129(a)(7) of the Code requires that each impaired class of claims or interests accept the Plan or receive or retain under the Plan on account of such claim or interest, property of a value as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. If Section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the Plan, on account of such claim, property of a value, as of the Effective Date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims. In order for the Plan to be confirmed, the Bankruptcy Court must determine that the Plan is in the best interests of the Debtor's creditors. Accordingly, the proposed Plan must provide the Debtor's creditors with more than they would receive in a Chapter 7 liquidation. It is anticipated that in a Chapter 7 liquidation, the Debtor's creditors, other than the secured creditors, would receive nothing. Accordingly, since the Plan proposes a substantial dividend to all creditors, such creditors are receiving more than they would receive in a Chapter 7 liquidation. Accordingly, the Plan satisfies the requirements of Section 1129(a)(7).

**Cramdown**

The Court may confirm the Plan even though less than all of the classes of claims and interests accept it. The requirements for confirmation of a Plan over the objection of one or more classes of claims or interests are set forth in Section 1129(b) of the Code.

## II
## REPRESENTATIONS

[Note: Paragraphs in brackets to be included after the Bankruptcy Court approves this Disclosure Statement.]

[This Disclosure Statement is provided pursuant to Section 1125 of the Code to all of the Debtor known Creditors and other parties in interest in connection with the solicitation of acceptance of its Plan, as amended or modified. The purpose of this Disclosure Statement is to provide such information as will enable a hypothetical, reasonable investor, typical of the holders of Claims, to make an informed judgment in exercising its rights either to accept or reject the Plan. A copy of the Plan is attached hereto as **Exhibit "A"**.]

[After a hearing on notice, the Court approved this Disclosure Statement as containing information of the kind and in sufficient detail adequate to enable a hypothetical, reasonable investor typical of the classes being solicited to make an informed judgment about the Plan.]

The information contained in this Disclosure Statement has been derived from the **Debtor**, unless specifically stated to be from other sources.

NO REPRESENTATIONS CONCERNING THE DEBTOR IS AUTHORIZED BY THE DEBTORS OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. THE DEBTOR RECOMMENDS THAT ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN REACHING YOUR DECISION ON HOW TO VOTE ON THE PLAN. ANY REPRESENTATION OR INDUCEMENT MADE TO YOU NOT CONTAINED HEREIN SHOULD BE REPORTED TO THE ATTORNEYS FOR DEBTOR WHO SHALL DELIVER SUCH INFORMATION TO THE COURT FOR SUCH ACTION AS MAY BE APPROPRIATE

ANY BENEFITS OFFERED TO THE CREDITORS ACCORDING TO THE PLAN WHICH MAY CONSTITUTE "SECURITIES" HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE FEDERAL SECURITIES AND EXCHANGE COMMISSION ("SEC"), THE TEXAS SECURITIES BOARD, OR ANY OTHER RELEVANT GOVERNMENTAL AUTHORITY IN ANY STATE OF THE UNITED STATES. IN

ADDITION, NEITHER THE SEC, NOR ANY OTHER GOVERNMENTAL AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATIONS TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS INTO THE FUTURE WITH ACCURACY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THE APPROVAL BY THE COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE PLAN OR GUARANTEE THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THE DEBTORS BELIEVE THAT THE PLAN WILL PROVIDE CLAIMANTS WITH AN OPPORTUNITY ULTIMATELY TO RECEIVE MORE THAN THEY WOULD RECEIVE IN A LIQUIDATION OF THE DEBTORS ASSETS, AND SHOULD BE ACCEPTED. CONSEQUENTLY, THE DEBTOR URGES THAT CLAIMANTS VOTE FOR THE PLAN.

DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS CORRECT, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND EACH CREDITOR AND INTEREST HOLDER IS URGED TO CAREFULLY REVIEW THE PLAN PRIOR TO VOTING ON IT.

III

FINANCIAL PICTURE OF THE DEBTOR

History and Background of the Debtor

Lochrann's opened in December of 2007 in Frisco Square. Although we were only the third restaurant to open in the Square, we were optimistic this would be short lived. At that time, there was promise of a Studio Movie Grill, parking garage, many other building units and businesses directly behind and around us. Whether it was due to economy or management of the Square, these things never came to fruition. In the three years, five other restaurants or bars have opened, two have closed and others who have had to claim bankruptcy, haven't paid rent, or rely on their other spaces to keep afloat. Lochrann's is on the bottom floor of a four story mixed used

building. Us along with another restaurant occupy the bottom floor and it is supposed to be offices above us. These spaces have largely been vacant up to recently with some taking partial of the space. Without more businesses and retail, we greatly struggle on all day parts to pull people in. Especially for lunch.

To add to the struggling development, prior to us opening our doors, the City of Frisco approved an ordinance for late night drinking, which moved the hours bars could be open from Midnight to 2am. This was very imperative for Lochrann's not only due to our forcasted liquor sales, but also due to our neighboring towns and competitors also having the 2am ordinance. Unfortunately, a group of citizens petitioned this and won, bringing the hours of operation back to midnight. This hugely impacted our plan and business. Not only are we losing two hours of potential profit, however, if patrons do come to dinner to Lochrann's, many leave early to head to an area where they can stay out later, or they don't even stay in Frisco all together. In order to compete against this, we were forced to add to our music program. Although this helps on some evenings, because without the music, nobody would come to the area; it in turn raises our overhead.

Due to having to turn to music to help generate a night scene, we were given the option to take over the space adjacent to our current space a few months after opening as we were told an ice cream shop was going to take it. We in turn took out another loan, and started construction of 2,000 more square feet to add a larger stage. Although it has been nice to have this space at times, again, it has been too much overhead for the amount of revenue we are able to pull in.

Like so many restaurants, overhead and cost control is crucial to the business. We initially struggled with this, however, are now very consistent and have cut as many areas as possible. Unfortunately, it just isn't enough. It has been a constant struggle to make ends meet. Due to this and knowing our challenges, we have met with the Square's management on several occasions to try and figure out how to make a go of it. The Debtor became delinquent on its IRS 941 taxes. The Debtor filed this proceeding to restructure its indebtedness.

### Post-Petition Operations

Upon filing the bankruptcy the Debtor had a dispute with a credit card lender known as Motherfund. The parties eventually worked out the problems and the debtor was able to continue operations. Since the filing of the bankruptcy, the Debtor has remained current on its post petition obligation. The Debtor has been negotiating with its current landlord concerning either restructuring the lease or moving locations. The Debtor and the landlord have reached an agreement whereby the Debtor will vacate it current space. The Debtor has located new space which it will move its operations. The Debtor has sought bankruptcy court approval to enter into the new lease agreement.

### Future Income and Expenses Under the Plan

Under the terms of the Plan, the creditors will receive cash payments over time from the continued operations of the Debtor. The Debtor has prepared projections forecasting the expected revenues and expenses for the next year. These projections are based upon the historical sales and the Debtor believes them to be feasible. The projections are attached hereto as Exhibit "B".

### Post-Confirmation Management

Upon Confirmation of the Debtor's Plan, November 23, 2009. Deina McNabb will remain the president of the Debtor. The partnership will continue to be owned by Lochrann's Management LLC as the 1% General partner, Charles Anderson as a 30% limited partner, Deina McNabb as a 50% limited partner, Nancy Fagely as a 10% limited partner and Mark Mooney as a 9% limited partner.

### IV.

### ANALYSIS AND VALUATION OF PROPERTY

The Debtor is primarily a service business. The Debtor maintains very little in the way of hard assets. As set forth in the Bankruptcy Schedules, the Debtor maintains tables, chairs, linens, limited food and liquor inventory and restaurant equipment, mainly consisting of cooking supplies and bar ware. All the Debtor's assets set forth above are subject to the lien of Amegy Bank in the amount of approximately $600,000. Because of the nature of the assets and the large debt to the bank, there is very little likelihood of any dividend to the unsecured creditors in the event of a liquidation of the assets of the Debtor.

A liquidation analysis of the Debtor's assets is attached hereto as Exhibit "C".

### V.
### SUMMARY OF PLAN OF REORGANIZATION

The Debtors' Plan will break the existing claims into 7 categories of Claimants. Tax, Secured and unsecured claimants will receive cash payments over a period of time. Existing Equity will receive no payments but will maintain a part of their ownership.

**Satisfaction of Claims and Debts**: The treatment of and consideration to be received by holders of Allowed Claims or interests pursuant to this Articles V and VI of this Plan shall be the sole an exclusive means for full settlement, release and discharge of their respective Claims, Debts, or interests. On the Confirmation Date, the Reorganized Debtors shall assume all duties, responsibilities and obligations for the implementation of this Plan. Any class of Claimants failing to vote on this Plan shall be deemed to have accepted this Plan in its present form or as modified or amended as permitted herein.

**Class 1 Claimants** (**Allowed Administrative Claims of Professionals and US Trustee**) are unimpaired and will be paid in cash and in full on the Effective Date of this Plan. Professional fees are subject to approval by the Court as reasonable. Debtors' attorney's fees approved by the Court and payable to the law firm of Eric Liepins, P.C. will be paid immediately following the later of Confirmation or approval by the Court out of the available cash. This case will not be closed until all allowed Administrative Claims are paid in full. Class 1 Creditor Allowed Claims are estimated as of the date of the filing of this Plan to not exceed the amount of $15,000 including Section 1930 fees. Section 1930 fees shall be paid in full prior to the Effective Date. The Debtor is required to continue to make quarterly payments to the U.S. Trustee and may be required to file post-confirmation operating reports until this case is closed. The Class 1 Claimants are not impaired under this Plan.

**Class 2 Claimants** (**Allowed Priority Tax Creditor Claims**) are impaired and shall be satisfied as follows: The Allowed amount of all Priority Tax Creditor Claims shall be paid out of the revenue from the continued operations of the business. The Priority Tax Creditor Claims are alleged to be the Internal Revenue Service ("IRS")Claims for 941 taxes asserted to be approximately $296,985.71. The Priority Claims of the IRS shall be paid over a 60 month period commencing on the Effective Date, with interest at a rate of 4% per annum making the monthly payment $5,605.The IRS unsecured claim shall be treated under Class 4. The IRS shall retain their liens against the property of the Debtor, but shall release their liens, if any, when paid in full as called for by this Plan.   a. **Events of Default.** The occurrence of any of the following shall constitute an event of default under the Plan:

1) **Failure to Make Payments.** Failure on the part of Debtor to pay fully
when due any payment required to be made in respect of the Plan Debt. However, due to the size and ongoing nature of the IRS's claim, upon a default under the plan, the administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal (or state) tax lien and the powers of levy, seizure, and as provided under the Internal Revenue Code. As to the IRS:

(A) If the Debtor or its successor in interest fails to make any plan payment, or deposits of any currently accruing employment or sales tax liability; or fails to make payment of any tax to the Internal Revenue Service within 10 days of the due date of such deposit or payment, or if the Debtor or its successor in interest failed to file any required federal or state tax return by the due date of such return, then the United States may declare that the Debtor is in default of the Plan. Failure to declare a default does not constitute a waiver by the United States of the right to declare that the successor in interest or Debtor is in default.

(B) If the United States declares the Debtor or the successor in interest to be in default of the Debtor's obligations under the Plan, then the entire imposed liability, together with any unpaid current liabilities, may become due and payable immediately upon written demand to the Debtor or the successor in interest.

© If a payment is not made within 14 days of such demand, then the Internal Revenue Service may collect any unpaid liabilities through the administrative collection provisions of the Internal Revenue Code. The IRS shall only be required to send two notices of default, and upon the

**DEBTOR'S DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE DATED MARCH 4, 2011 - Page 8**

third event of Default the IRS may proceed to collect on all amounts owed without recourse to the Bankruptcy Court and without further notice to the Debtor. The collection statute expiration date will be extended from the Petition Date until substantial default under the Plan. All payments will be sent to: IRS, attn: Lorraine Washington, 1100 Commerce Street, Mail Code 5024 DAL, Dallas, Texas 75242.

(D) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor to the Internal Revenue Service; but the Internal Revenue Service shall not take action to actually collect from such persons unless and until there is a default under the Plan and as set forth above.

Collin County, Frisco ISD, and the City of Frisco (collectively hereinafter "Ad Valorem Taxes") for unpaid business personal property taxes shall be treated as secured claims. The Debtor believes the tax liability for Ad Valorem Taxes for unpaid Ad Valorem taxes to Collin County is $1,520.11, to Frisco ISD is $6,286, and to City of Frisco $2,023. The Ad Valorem Taxes will receive post-petition pre-confirmation interest at the state statutory rate of 12% per annum and post-confirmation interest at the rate of 12% per annum. The Debtor will pay the Ad Valorem Taxes over a period of 60 months from the Effective Date, commencing on the Effective Date. The Debtor's total monthly payment to pay the Ad Valorem Taxes will be approximately $219. The Taxing Authorities shall retain their statutory senior lien position regardless of other Plan provisions, if any, to secure their Tax Claims until paid in full as called for by this Plan.

The Class 2 Claimants are impaired under this Plan.

**Class 3 Claimant (Allowed Claim of Motherfund)** is impaired and shall be satisfied as follows: On or about June 18, 2010 the Debtor and Motherfund entered into a Merchant Agreement. Pursuant to the terms of the Merchant Agreement Motherfund lent the Debtor $67,500. On or about August 12, 2010 Motherfund and the Debtor entered into a second Merchant Agreement whereby Motherfund lent the Debtor $33,750 (collectively the "Motherfund Agreements"). Pursuant to the Motherfund Agreements, Motherfund was owed $55,552.64 as of the Petition Date. Motherfund shall have an allowed claim equal to $55,552.64 less all funds collected by Motherfund post-petition[1] (the "Allowed Motherfund Claim"). The Allowed Motherfund claim shall be paid through the receipt by Motherfund of 12% of the Debtor's credit card receivables until paid in full the Allowed Motherfund Claim. Once the allowed Motherfund Claim has been paid, the Debtor will have no further obligation to use the Motherfund credit card processor. The Class 3 Claimant is impaired under this Plan.

**Class 4 Claimant (Allowed Secured Claim of Amegy Bank)** is impaired and shall be satisfied as follows: The Secured Claim of Amegy Bank ("Amegy") arises out of that certain

---

[1] Motherfund shall be required to provide Debtor with a reconciliation of its allowed claim at the confirmation hearing.

Promissory Note dated March 9, 2007 in the original principal amount of $617,700. The Debtor also executed a second Promissory Note to Amegy in the original principle amount of $400,000 (the "Amegy Notes"). The Amegy Notes were secured by that certain Security Agreement executed on March 9, 2007 granting Plains security interest in, among other things, all Debtor's equipment, inventory and accounts. (the "Amegy Collateral"). The total Amegy indebtedness as of the date of the petition was $623,074.39. The funds from the Amegy Notes were used by the Debtor to complete the finish-out of the restaurant. The Debtor believes the current value of the Amegy Collateral does not exceed the amount of the total Amegy indebtedness. Therefore Amegy will be allowed a Class 4 Claim in the amount of $623,074.39. The Amegy Class 4 claim shall be paid in monthly payments over a period of 180 months with interest at the rate of 5% per annum. The monthly payments to Amegy on the Class 4 claim will commence of the Effective Date and will be $4,927. The Debtor may pre-pay the Amegy claim at any time without penalty. Amegy shall maintain its lien on the Amegy Collateral until its Class 4 Claim is paid in full. Class 4 is impaired under this Plan.

**Class 5 Claimants (Allowed Unsecured Creditors)** are impaired and shall be paid their Allowed Unsecured Claim on a pro rate basis from the Unsecured Creditors Pool. The Debtor shall make monthly payments of $2,000 into the Unsecured Creditors Pool commencing on the Effective date. The Debtor shall make distributions to the Class 5 Unsecured Creditors every 90 days commencing 90 days after the Effective Date. The Debtor will make a total of 20 disbursements to the Unsecured Class 5 Creditors. The Debtor shall make a total of $120,000 in payments into the Unsecured Class 5 Creditor's pool. Based upon the Debtor's Schedules and the Proofs of Claim on filed the Debtor anticipates the total amount of Class 5 Creditors will be approximately $400,000. The Class 5 creditors are impaired under the Plan.

**Class 6 (Allowed Insider Unsecured Claims)** are impaired and shall not receive any distribution under the Plan. Class 6 creditors are impaired.

**Class 7 Claimants (Allowed Equity Holder Claims)** are not impaired. The current owners shall be allowed to retain their ownership interests in the Debtor. The Class 7 Creditors are not impaired under this Plan.

## ARTICLE VI
## MECHANICS/IMPLEMENTATION OF PLAN

Debtor anticipates continuing its current operations to fund the Plan. However, the debtor will be vacating its current location and will move its operations to the new Dallas Convention Center Hotel. The Debtor shall also use its cash reserves to fund the Plan. All payments under the Plan shall be made through the Disbursing Agent.

As specified in Section 1125(e) of the Bankruptcy Code, persons that solicit acceptances or rejections of this Plan and/or that participate in the offer, issuance, sale or purchase of securities offered or sold under this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, are not liable on account of such solicitation or participation for

violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejection of this Plan or the offer, issuance, sale or purchase of securities.

## VII.
## FEASIBILITY OF PLAN

Based upon the projected income of the Debtor which is based on the historical operations of the Debtor, the Debtor believes the Plan to be feasible.

Neither the Debtor, nor any member, officer, director, employee, agent, or professional shall have or incur any liability to any holder of a Claim or Equity Interest for any act, event, or omission in connection with, or arising out of, the Chapter 11 Cases, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence.

## VIII.
## RETENTION OF JURISDICTION

The Bankruptcy Court's jurisdiction shall be retained under the Plan as set forth in Article XIV of the Plan.
This Plan shall be the sole and exclusive remedy for any Creditor of the Debtors dealt with herein, so long as Debtors or the Reorganized Debtors are not in default under the Plan.

## IX.
## ALTERNATIVES TO DEBTOR"S PLAN

If the Debtor's Plan is not confirmed, the Debtors' bankruptcy case may be converted to a case under Chapter 7 of the Code, in which case a trustee would be appointed to liquidate the assets of the Debtors for distribution to its Creditors in accordance with the priorities of the Code. Generally, a liquidation or forced sale yields a substantially lower amount.
The Debtor owes monies to various taxing authorities and to its Secured Creditor Amegy Bank. The claims of Amegy Bank and the taxing authorities would need to be paid prior to the unsecured creditors receiving any funds. Based upon the amount of the debt and the value of the Debtor's assets a liquidation of the Debtor's assets would not provide any funds for the unsecured creditors.

## X
## RISKS TO CREDITORS UNDER THE DEBTOR"S PLAN

Claimants should be aware that there are a number of substantial risks involved in consummation of the Plan. The risk connected with this Plan is the Debtor's ability to maintain operations at the historical level of sales in order to make the payments to the creditors. The Plan contemplates that there will be excess funds to pay Creditor Claims.

# XI.
# TAX CONSEQUENCES TO THE DEBTOR

Implementation of the Plan may result in federal income tax consequences to holders of Claims, Equity Interest Holders, and to the Debtors. Tax consequences to a particular Creditor or Equity Interest Holder may depend on the particular circumstances or facts regarding the Claim of the Creditor or the interests of the Equity Interest Holder. CLAIMANTS ARE URGED TO CONSULT THEIR OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS.

Pursuant to the Plan, a significant portion of the outstanding indebtedness of the Debtor is being satisfied at a discount. The debt forgiveness income resulting from the satisfaction of Claims at a discount should not constitute taxable income, although it will reduce tax attributes, such as net operating loss ("NOL") carryovers. The utilization of any NOLs remaining after application of the attribute reduction rules may be subject to limitations imposed by section 382 of the Tax Code. In this case, however, the Debtor does not currently have NOL's which would be effected by the Plan.

# XII.
# PENDING OR ANTICIPATED LITIGATION

The Debtor has evaluated potential claims which may be brought. The Debtor does not believe any claims under the provision of the Bankruptcy Code exist which would be beneficial for the Debtor to pursue. There are no claims the Debtor is aware of which would provide a greater return to the creditors of the estate than is provided in the Plan.

Dated: March 4, 2011.

Respectfully submitted,

Lochrann's Irish Pub & Eatery, Ltd

   /s/ Deina McNabb
By: Deina mcNabb
Its: Managing Member of General Partner

ERIC A. LIEPINS
ERIC A. LIEPINS, P.C.
12770 Coit Road
Suite 950
Dallas, Texas 75251
(972) 991-5591
9972) 991-5788 - telecopier

ATTORNEY FOR DEBTOR

LIQUIDATION ANALYSIS EXHIBIT "C"

| ASSETS | CHAPTER 11 VALUE | CHAPTER 7 VALUE |
|---|---|---|
| CASH | $25,000 | $25,000 |
| kitchen equip, glassware etc | $100,000 | $40,000[2] |
| inventory | $10,000 | $5,000[3] |

---

[2] The debtor believes that the sale of the equipment could recognize 40% of the cost value.

[3] The inventory would likely realize only 50% of its cost value on a force sale basis.

**DEBTOR'S DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE DATED MARCH 4, 2011 - Page 13**

LIABILITIES

| | | |
|---|---|---|
| ADMINISTRATIVE | $15,000 | $15,000 |
| TAXES | $300,000 | $300,000 |
| SECURED CLAIMS | $600,000 | $600,000 |
| UNSECURED CREDITORS | $400,000 | $400,000[4] |
| | | |
| Distributions to unsecured creditors | 30% | 0% |

---

[4] The insider claims would not be waived in a Chapter 7.